**VICTORIA BOOKE, State Bar No.: 142518**
vbooke@bookelaw.com
**Booke & Ajlouny**
**606 North First Street**
**San Jose, California 95112**
**Telephone:     (408) 286-7000**
**Facsimile:     (408) 286-7111**

**ANDREW T. MILTENBERG (*pro hac vice forthcoming*)**
amiltenberg@nmllplaw.com
**GABRIELLE M. VINCI (*pro hac vice forthcoming*)**
gvinci@nmllplaw.com
**Nesenoff & Miltenberg, LLP**
**363 7th Avenue, 5th Floor**
**New York, New York 10001**
**Telephone:     (212) 736-4500**
**Facsimile:     (212) 736-2260**

**Attorneys for Plaintiff**
**CAMILLE GEAR RICH**

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| **CAMILLE GEAR RICH,**<br><br>                    **Plaintiff,**<br>          **v.**<br><br>**UNIVERSITY OF SOUTHERN CALIFORNIA,**<br>**UNIVERSITY OF SOUTHERN CALIFORNIA**<br>**GOULD SCHOOL OF LAW, and the**<br>**BOARD OF TRUSTEES OF THE UNIVERSITY OF**<br>**SOUTHERN CALIFORNIA,**<br><br>                    **Defendants.** | Case No.: _____<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. Discrimination - Title VII of the Civil Rights Act of 1964<br>2. Discrimination - Title IX of the Education Amendments of 1972<br>3. Discrimination - California Fair Employment and Housing Act<br>4. Discrimination - Americans with Disabilities Act of 1990<br>5. Discrimination - California Fair Employment and Housing Act<br>6. Deliberate Indifference - Title IX of the Education Amendments of 1972<br>7. Retaliation |

Plaintiff Camille Gear Rich ("Plaintiff" or "Professor Rich"), by and through her under-signed counsel, alleges upon knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as follows:

**THE PARTIES**

1.   The University of Southern California ("Defendant USC" or the "University") at all relevant times, was and continues to be a private university organized and existing under the laws of the State of California.

2.   The University of Southern California Gould School of Law ("Defendant USC Law" or "USCGSOL") is, upon information and belief, the oldest law school in the Southwestern region of the United States and is owned, operated, and managed by Defendant USC.

3.   The Board of Trustees of the University of Southern California ("Defendant Board") is comprised of fifty (50) voting members who have the general obligations to protect the interests of Defendant USC, and the rights, safety, and welfare of the University's students, faculty, and staff.

4.   Furthermore, the Defendant Board is the governing body of the University and is charged with the authority and duty to determine policies and to make or approve rules and regulations to promote the mission of the University. This legally imposed duty includes the authority to delegate administrative responsibilities to supervise and control the conduct of any member or segment of the University community who impedes, obstructs, or seriously threatens the mission of the University, including the rights, safety, and welfare of its students, faculty, and staff.

5.   The Defendant Board is being named as a Defendant herein to the extent that it is the proper party notwithstanding, and/or is the real party in interest to defend this action against the University and/or USCGSOL.

**STATEMENT OF JURISDICTION**

6.   This Court has federal question jurisdiction and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because the federal law claims arise under the Constitution and

statues of the United States, and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

7.    This Court has personal jurisdiction over Defendants on the grounds that Defendants conduct business within the State of California, Los Angeles County.

8.    At all relevant times, the actions and events discussed herein transpired within the State of California, Los Angeles County.

9.    Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because Defendants are considered to reside in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

10.    All conditions precedent to filing have been fulfilled.

11.    Prior to filing a civil action for relief, Plaintiff timely filed a Charge of Discrimination simultaneously with the California Civil Rights Department ("CCRD") and the Equal Employment Opportunity Commission ("EEOC").

12.    On March 31, 2025, the EEOC issued Plaintiff a Notice of Right Sue with respect to her claims against Defendants USC and USCGSOL.

13.    On April 22, 2025, the EEOC issued Plaintiff a Notice of Right Sue with respect to her claims against the Defendant Board.

14.    This matter is being filed within 90 days of Plaintiff's receipt of her Notices of Right to Sue from the EEOC.

**OPERATIVE FACTS**

**I.    Professor Rich's Esteemed Background and Prior Marriage to USCGSOL Professor, Stephen Montgomery Rich**

15.    In the Spring of 2007, following her career in private practice, Professor Rich was hired as a tenure track professor at Defendant USC Law.

16.    Professor Rich's then husband, Stephen Montgomery Rich ("Professor Montgomery Rich"), was granted a courtesy "trailing spouse" faculty appointment to provide Professor Rich with a further incentive to join the USCGSOL faculty.

17.    Professor Rich continues to serve as a professor at USCGSOL.

18.   Over the course of her career at USCGSOL, Professor Rich has established herself as an esteemed and valuable asset to Defendant USC Law.

19.   Professor Rich has, among many other things, (i) founded and directed PRYSM, Defendant USC's Initiative for the Study of Race, Gender, Sexuality, and the Law; (ii) served as the Associate Provost of Diversity and Inclusion; (iii) served as the Associate Provost for Student and Faculty Initiatives in the Social Sciences; and (iv) was responsible for spearheading and advancing Defendant USC's and USCGSOL's diversity and inclusion initiatives.

20.   Further, Professor Rich received numerous visiting professor offers from prestigious law schools across the country such as Harvard Law School, Stanford Law School, and Yale Law School.

21.   In or around 2003, Professor Rich married her now-former husband, Professor Montgomery Rich. At the time, and continuing to date, Professor Montgomery Rich was also a professor of law at USCGSOL.

22.   In the Spring of 2014, Professor Rich was promoted to a full Professor with Tenure and awarded the title of Professor of Law and Sociology.

23.   Defendant USC granted Professor Rich a dual appointment with both USCGSOL and the USC Dornsife School of Sociology.

24.   In the Spring of 2015, then Provost Michael Quick appointed Professor Rich to the role of Associate Provost of Student and Faculty Initiatives in the Social Sciences and later, to also serve as a Provost-level Diversity Liaison.

25.   Professor Rich's promotions stemmed from previous recognition for being a key diversity advocate in the search for a new law school dean which resulted in Dean Andrew Guzman ("Dean Guzman") being hired.

26.   In or around 2015, Professor Rich and Professor Montgomery Rich became estranged and began the process of seeking a dissolution of their marriage which was not granted until August of 2019.

## II. Professor Montgomery Rich Exhibits Threatening and Erratic Behavior Towards Professor Rich to Other Faculty Members Who Fail to Report or Discipline His Behavior

27. In 2015, after Professor Rich and Professor Montgomery Rich separated, USCGSOL was put on notice as to Professor Montgomery Rich's erratic conduct and repeated attempts to defame Professor Rich to her colleagues.

28. By way of example, but not limitation, Professor Montgomery Rich purposefully spoke with several faculty members and colleagues at Defendant USC Law about his estranged marriage.

29. Upon information and belief, during these discussions, Professor Montgomery Rich painted himself the tormented victim in the situation with the intent of incentivizing his colleagues to pressure Professor Rich into returning to her marriage.

30. Despite Professor Montgomery Rich's unprofessional behavior, no faculty members reported him to Defendant USC's then-titled Office of Equity and Diversity ("OED").

31. Dean Nancy Staudt ("Dean Staudt"), the Interim Dean of Defendant USC Law, recognized the position that Professor Rich was being placed in and provided her with a financial subsidy to allow her to move out of the home she shared with Professor Montgomery Rich.

32. Professor Rich further requested that her mortgage subsidy be converted into a rent subsidy, which the University granted.

33. After the appointment of Dean Guzman in 2015, Professor Montgomery Rich's defamation campaign against Professor Rich continued. Unlike Dean Staudt, Dean Guzman ignored the ongoing hostile environment for Professor Rich despite her constant pleadings to Dean Guzman.

34. Specifically, Professor Rich complained to Dean Guzman about the hostile behavior of her coworkers, Professor Edward Kleinbard and Professor Ariela Gross. Despite Professor Rich's repeated complaints, no action was taken by Dean Guzman and the issues were not addressed by the OED.

35. Upon information and belief, Professor Montgomery Rich met with Dean Guzman around the same time as Professor Rich.

36.    Upon information and belief, at that time Professor Montgomery Rich raised questions about Professor Rich's salary and compensation, and attempted to claim the housing subsidy the University had granted Professor Rich for himself.

37.    Upon information and belief, Professor Montgomery Rich held these conversations in the hope of convincing Dean Guzman that Professor Rich should be barred from University financial assistance in the future.

38.    Upon information and belief, not only did Dean Guzman improperly hold this meeting, but Dean Guzman also failed to report Professor Montgomery Rich's out of line behavior to the OED.

III.    **Professor Rich Reports Professor Montgomery Rich's Affair with a Student to Defendant USC**

39.    In 2019, after suffering for years in a hostile work environment, Professor Rich's Post Traumatic Stress Disorder ("PTSD") spiked after learning that Professor Montgomery Rich was having an ongoing affair with a student at Defendant USC Law.

40.    The affair was further confirmed to Professor Rich by her housekeeper who informed her that the student eventually transferred law schools and was pregnant.

41.    Upon information and belief, Professor Montgomery Rich had previously lied to Professor Rich in parenting meetings when Professor Rich asked him if he had become romantically involved with a student, which he denied.

42.    Professor Montgomery Rich's affair with a student only made Professor Rich's work environment more caustic.

43.    After word got out that Professor Montgomery Rich was having an affair with a student, other students at USCGSOL would approach Professor Rich to discuss the affair with her.

44.    On at least one occasion, students offered themselves to Professor Rich for sex as a means to "get back at" Professor Montgomery Rich.

45.    On July 19, 2019, Professor Rich filed two formal complaints against Professor Montgomery Rich with Defendant USC's OED.

46.    The first complaint alleged that Professor Montgomery Rich had violated Defendant USC's Policy on Prohibited Discrimination, Harassment and Retaliation by engaging in a sexual relationship with a student creating a hostile educational environment for students.

47.    The second complaint alleged that she had been subjected to a hostile work environment due to Professor Montgomery Rich's ongoing sexual relationship with his student, who became pregnant as a result of such affair.

48.    On July 23, 2019, Professor Rich received an email from the head of OED, Gretchen Dahlinger Means ("Ms. Means") letting her know that her case had been assigned to OED manager, John Jividen ("Mr. Jividen").

49.    About a week after the case was assigned to Mr. Jividen, Professor Rich requested that OED's process be briefly paused, specifically for two weeks, to allow Professor Rich to finalize her divorce from Professor Montgomery Rich.

50.    As part of her request, Professor Rich expressed to the OED her desire to pause the complaint due to her fear that Professor Montgomery Rich would retaliate against her for filing the complaint against him, and she was worried about how the complaint would impact her divorce and custody proceedings.

## IV.    Professor Rich Requests a Leave of Absence and is Met with Reluctancy by USCGSOL's Dean

51.    Over the course of their estrangement and divorce proceedings, Professor Rich was subjected to torment by Professor Montgomery Rich which resulted in Professor Rich suffering an episode of post-traumatic stress disorder ("PTSD").

52.    Professor Rich's PTSD symptoms were exacerbated by the daily and worsening caustic environment she had been subjected to at Defendant USC Law as a result of her estranged husband's unapologetic behavior and affair with his student.

53.    Seeking some semblance of relief, on August 7, 2019, Professor Rich met with Christine Street ("Ms. Street") about accommodations for the PTSD she was suffering due to the actions of Professor Montgomery Rich.

54.   During the August 7 meeting, Professor Rich agreed with Ms. Street that she would refrain from her responsibilities at the law school for the Fall 2019 semester and resume all of her duties in the Spring of 2020. In essence, Professor Rich was given a paid semester leave.

55.   Upon information and belief, Andrew Guzman, the dean of USCGSOL ("Dean Guzman"), for reasons unknown, did not approve of Professor Rich being given a paid semester leave and instead wanted her to receive either no pay or solely disability benefits.

56.   Indeed, over email communications between Professor Rich and Ms. Street, Professor Rich learned of Dean Guzman's disapproval of her paid leave and continuing reluctance to provide any further requested accommodations, such as a writing assistance program to help Professor Rich manage her PTSD upon her return to campus and request for a new classroom away from the Defendant USC Law campus, which was a highly triggering location for Plaintiff.

57.   Upon information and belief, Dean Guzman enjoyed a close personal and professional relationship with Professor Montgomery Rich and was resentful towards Professor Rich for her pending reports of sexual misconduct against Professor Montgomery Rich.

## V.    Professor Rich Reignites her OED Complaints and is Immediately Retaliated Against by Professor Montgomery Rich

58.   On or about August 28, 2019, after receiving reassurance from her faculty advisor, Rebecca Lonegran ("Ms. Lonegran"), Professor Rich re-submitted her complaint memo to the OED.

59.   The complaint again detailed multiple Title IX allegations against Professor Montgomery Rich consisting of, among other things, (i) creating a hostile environment for students; (ii) creating a hostile environment for Professor Rich as a faculty member; and (iii) Professor Rich's fear of retaliation for reporting the offense.

60.   Professor Rich's fears of retaliation were well-founded.

61.   Upon information and belief, Professor Montgomery Rich was notified of Professor Rich's complaints against him. Thereafter, Professor Montgomery Rich repeatedly attempted to use Professor Rich's allegations as a basis to attack her during their divorce proceedings.

62.    Professor Montgomery Rich accused Professor Rich of being promiscuous and an obstructionist in their divorce, attempted to use his connection to Dean Guzman to further disrupt Professor Rich's work environment and professional relationships, and attempted to take ownership of the housing subsidy that Defendant USC had provided to Professor Rich by claiming that the subsidy was his own personal property.

63.    Professor Rich reported Professor Montgomery Rich's antics to Defendant USC but to no avail; Professor Montgomery Rich's behavior went unremedied and unaddressed by Defendant USC as Professor Rich's work environment continued to deteriorate.

## VI.    Defendant USC Protects Professor Montgomery Rich and Fails to Properly Investigate Professor Rich's Claims Against Him

64.    After Professor Rich's August 2019 report to OED, Professor Montgomery Rich repeatedly referenced the allegations during co-parenting sessions with Professor Rich.

65.    Specifically, during co-parenting sessions, Professor Montgomery Rich persistently warned Professor Rich to stop pursuing a Title IX investigation and confidently gloated that there would be no Title IX investigation against him.

66.    Alarmed by Professor Montgomery Rich's poorly veiled threats, Professor Rich reached out to Mr. Jividen via email to report Professor Montgomery Rich's behavior during their co-parenting sessions and to ask about the status of the Title IX investigation.

67.    Mr. Jividen aloofly stated that at that time, October of 2019, the OED was interviewing witnesses; however, Mr. Jividen indicated, without justification, that Defendant USC saw no need to reach out to Professor Montgomery Rich about the allegations or ongoing harassment of Professor Rich.

68.    Thereafter, Mr. Jividen held a meeting in the Fall of 2019 with Professor Rich to go over the status of her complaint.

69.    With respect to the OED's efforts to collect evidence of the allegations, Mr. Jividen shared that (i) one witness refused to speak with the OED and claimed she was offended by the request; (ii) another student was able to confirm that rumors existed as to a sexual relationship between Professor Montgomery Rich and his former student but the witness student had no

knowledge of any actual relationship; and (iii) a third student, who had previously claimed to have had inappropriate sexual conduct with Professor Montgomery Rich, refused to come into the OED office despite originally agreeing to be interviewed.

70.    Despite all of the above information, Mr. Jividen still felt and relayed to Professor Rich that there was no need to inconvenience Professor Montgomery Rich with the investigation of the very serious allegations against him.

71.    Mr. Jividen reassured Professor Rich that the investigation would remain open despite his resistance to reach out to Professor Montgomery Rich.

72.    Between the Fall of 2019 and January 28, 2020, the OED and Mr. Jividen failed to report any findings or status updates to Professor Rich regarding her complaints or the ensuing investigation.

73.    On January 28, 2020, Professor Rich was alerted that the OED along with Ms. Means had transferred her complaint from Mr. Jividen to Dean Guzman. No justification for the transfer was provided.

74.    Dean Guzman was the improper person to take hold of the investigation. Dean Guzman did not hold any acting positions in the OED and therefore should not have been involved in any OED investigation or a Title IX complaint.

75.    Moreover, Dean Guzman could not be a neutral decisionmaker as he had prior conflicts of interest with the parties. Indeed, Dean Guzman had already questioned the credibility of Professor Rich's complaints and reports in connection with her need for disability accommodations. He further maintained a close personal and professional relationship with Professor Montgomery Rich.

76.    After taking over the investigation, Dean Guzman notified Professor Rich that the original investigation was concluded after a finding that there was insufficient evidence to conduct a further and more in-depth investigation.

77.    In essence, Dean Guzman conceded that OED, in response to serious allegations of sexual misconduct, performed only a perfunctory and sham inquiry into the report and just as quickly dismissed the complaint as unfounded without further inquiry.

78.    Notably, the investigation's erroneous conclusion only pertained to Professor Rich's report of a violation of Section 6 of the Faculty Handbook which deals with Discrimination, Harassment, and Retaliation.

79.    Plaintiff had also asked the OED to investigate claims stemming from Chapter 3 of the Faculty Handbook which dealt with Conflicts of Interest.

80.    Defendant USC's handling of Plaintiff's Title IX complaint of harassment, discrimination, and sexual misconduct fell far short of Defendant USC's investigatory obligations under both federal law and Defendant USC's own policies.

81.    By way of example, but not limitation, Professor Rich was never afforded certain protections which she was entitled to after the filing of her original complaint.

82.    As stated specifically in Faculty Handbook Section 6-(A)(9)(b):

> "[A]ll proceedings, including the investigation, appeals, and griev-
> ances, shall be conducted in a manner (a) that is consistent with Uni-
> versity policies and transparent to the reporting party and the re-
> sponding party … (c) provides to the reporting party and responding
> party, and appropriate officials timely and equal access to infor-
> mation that will be used after the fact finding investigation and dur-
> ing informal and informal disciplinary meetings and hearings and
> (d) are conducted by officials who do not have a conflict of interest
> or bias for or against the reporting party or responding party.   For
> cases that involve . . . domestic violence . . . the proceedings must
> be conducted by officials who, at a minimum, receive annual train-
> ing on the issues related to   . . . domestic violence . . . .and on how
> to conduct an investigation and hearing process that protects the
> safety of victims and promotes accountability."

83.    Defendant USC failed to provide transparency to Professor Rich at any time during the sham investigation.

84.    By way of further example, but not limitation, the investigation of Professor Rich's complaint was not completed within the 60 or 90 day window as prescribed in section 6-(E)-(4) of the Faculty Handbook.

85.    Specifically, the Faculty Handbook provided, in relevant part,

> The Designated Investigator shall attempt to complete the investi-
> gation and make a written report as efficiently and promptly as pos-
> sible. Absent extenuating circumstances, [it should] . . . determine if

this policy was violated and make additional determinations as to sanctions . . .within 60 days of the date of notice to the responding party, and for other complaints within 90 days. If the report is not complete within the stated 60- or 90-day time frame . . . [parties] may ask the official who has authority over the Office of Equity, Equal Opportunity and Title IX to explain why it is not yet complete." Special provisions for extended delay, with notice, are available in cases involving domestic violence.

86.    Rather, it took nearly seven months for Professor Rich to hear back from the OED to be told only that an improper party (Dean Guzman) had taken over jurisdiction of the investigation.

87.    The OED further failed to take even the most basic investigatory steps during the minimal process it did employ, further evidencing the sham nature of the OED's inquiry.

88.    By way of example, but not limitation, the OED, by Mr. Jividen's own admissions, failed to ever interview Professor Montgomery Rich about the allegations Professor Rich made against him. Professor Montgomery Rich was never asked about the threats he made to Professor Rich and the sexual relationship he had with a student.

89.    The OED further failed to follow up on credible evidence and reports that Professor Rich had been subjected to an ongoing hostile work environment.

90.    Professor Rich provided the OED with plentiful evidence to demonstrate that Professor Montgomery Rich had concealed the relationship with his student and made threats to Professor Rich causing her to feel unsafe on campus.

91.    Upon information and belief, the OED never inquired into the baseless sexual innuendos and rumors that were made about Professor Rich during their investigation and focused narrowly on the one issue of when Professor Montgomery Rich's relationship began with the student and if other students were subject to sexual harassment by Professor Montgomery Rich.

92.    Further, upon information and belief, the OED failed to consider from the very beginning any claim of a hostile environment towards Professor Rich and favored Professor Montgomery Rich throughout its investigation.

93.    Further, instead of notifying Professor Rich of the OED's findings, Ms. Means chose instead to push the investigation off onto Dean Guzman, resulting in Professor Rich's inability to appeal the erroneous findings being improperly stripped from her.

94.    After taking over the investigation, Dean Guzman advised that he would be investigating the Chapter 3 claims and specifically stated that:

> For these Chapter 3 claims, OED has declined to exercise jurisdiction and has referred the issues back to [USCGSOL]... I understand your concerns relate to whether [Professor Montgomery Rich] was required to disclose his relationship with Deanna Rafla-Yuan under Section 3-G(d), whether [Professor Montgomery Rich]had a work-related conflict of interest under Section 3-G(b), or whether he exercised poor management and a potential conflict of interest under Section 3-G.

**VII.    Dean Guzman Further Prolongs the Investigation into Professor Rich's Complaint Due to His Own Biases Against Her.**

   **A.    Dean Guzman Opens an Investigation but Fails to Provide Professor Rich with any Information or Updates**

95.    After learning that Dean Guzman had taken over jurisdiction of Professor Rich's Section 3 complaints, Professor Rich emphasized the importance of maintaining a neutral position towards Professor Montgomery Rich and implored Dean Guzman to remain objective in his investigation.

96.    Professor Rich, worried about further retaliation from Professor Montgomery Rich, tried to emphasize to Dean Guzman that the issue here is not only a conflict between the ex-spouses, but also the serious implications the behavior of Professor Montgomery Rich had on the school at large.

97.    On or about February 11, 2020, Dean Guzman officially opened an investigation into Professor Rich's allegations under Chapter 3 of the Faculty Handbook. The scope of the investigation was strictly limited to the portions of Chapter 3 of the Faculty Handbook which deal with "conflict of interest" and further when a faculty member fails to properly manage a "potential conflict of interest."

98.    Once again, Defendant USC flagrantly disregarded those portions of Professor Rich's complaint which reported her subjection to a hostile work environment and the detrimental effects such a toxic workplace was having on her health.

99.   Upon learning the very narrowly limited scope of Dean Guzman's investigation, Professor Rich reached out to him to again explain the trauma inflicted upon her by the ongoing situation involving Professor Montgomery Rich.

100.   Once again, Professor Rich's concerns were dismissed and met only with a boilerplate response from Dean Guzman regarding his need to remain fair to both parties, seemingly implying that Professor Rich's experiences would not be taken into consideration in his investigation against Professor Montgomery Rich.

101.   Notably, Dean Guzman's actions directly violated the agreement the University had negotiated with the United States Department of Civil Rights ("OCR") to resolve its prior decades long pattern of bad faith resolution of Title IX violations.

102.   Specifically, on February 27, 2000, Defendant USC entered into a Resolution Agreement with OCR (hereinafter the "Tyndall Resolution") wherein Defendant USC pledged that all Title IX complaints would from then on be conducted by qualified and independent OED personnel with the goal of preventing conflicts of interest.

103.   The Tyndall Resolution pledged that OED, as an independent and trained body, would now be assigned to handle all Title IX complaints and report to the newly appointed Senior Vice President.

104.   Under the Tyndall Resolution, Defendant USC represented, among other things, that "[t]he University will ensure that the Title IX Office has the appropriate authority to effectively coordinate the University's compliance with Title IX, and that it oversees all of the University's Title IX investigations, including but not limited to conducting investigations and resolutions of all complaints alleging sex discrimination regardless of whether the complaint is filed against a student, faculty or staff."

105.   In addition to mandating that all future Title IX related complaints would be handled by OED, the Tyndall Resolution also provided that all then-prior complaints and reports of sex discrimination involving an employee would be returned to OED for investigation and handling.

106. No one advised Professor Rich of her new rights under the Tyndall Resolution. Rather, Dean Guzman and Defendants at large used Professor Rich's ignorance of the protections of the Tyndall Resolution as a means to further support Professor Montgomery Rich.

107. Contrary to the unequivocally clear mandates of the Tyndall Resolution, Dean Guzman retained control of Professor Rich's Title IX complaint, and effectively buried and warehoused Professor Rich's complaint in his office.

108. Specifically, once Dean Guzman took jurisdiction, Professor Rich heard nothing further from Dean Guzman on the status of her case until eight months later, a time period well beyond the 10-business day reply period required under the Tyndall Resolution.

109. On or about September 27, 2020, Dean Guzman reported that the reason for the delay in issuing a decision on the investigation was due to the COVID-19 Pandemic.

110. Notably, at no point between February 11 and September 27 did Dean Guzman, or anyone else at Defendant USC or Defendant USC Law, reach out to Professor Rich to advise her that the ongoing pandemic, or any other reason, had caused a delay in the investigation.

111. Rather, Dean Guzman kept Professor Rich in suspense and, only after an inordinate amount of time had passed, used the COVID-19 pandemic as an excuse to cover his failings during his supposed investigation.

112. Because of this inordinate delay and the continuing threat of retaliation from Professor Montgomery Rich during this period, Professor Rich's PTSD condition worsened.

113. Professor Rich's fears regarding Dean Guzman's lack of training and his preference for Professor Montgomery Rich were not unfounded.

114. Indeed, contrary to his undue delay in concluding the investigation into Professor Rich's complaint, Dean Guzman was swift to issue Professor Montgomery Rich a congratulatory email in March of 2020 upon the birth of Professor Montgomery Rich's twin children with the student he had an affair with.

115. This message, which was directed as well to the faculty currently participating in the investigation against Professor Montgomery Rich, signaled Dean Guzman's preferences in the matter and compromised the fair and impartial nature of the investigation.

116.  On or about September 27, 2020, Dean Guzman issued a statement stating that he found Professor Montgomery Rich had committed no violations under Chapter 3 of the Faculty Handbook. At no point in his statement or findings did Dean Guzman reference Professor Rich's complaint of a hostile work environment or her tandem Title IX related complaint.

117.  Moreover, Dean Guzman made no findings regarding Professor Rich's complaints related to retaliation from Professor Montgomery Rich, Upon information and belief, no investigation into the retaliation Professor Rich faced at the hands of her ex-husband was ever conducted.

**B.  Dean Guzman Impedes Professor Rich's Ability to Appeal The Investigation's Conclusions and Findings**

118.  On October 2, 2020, Professor Rich sent Dean Guzman a notice of appeal and requested (i) clarification of the faculty's role in the determination; (ii) faculty committee's decision and whether it differed from Dean Guzman's own, (iii) steps taken to confirm the claims made by Professor Montgomery Rich, and (iv) how credibility determinations were made.

119.  On October 9, 2020, once again flouting the requirement under the Tyndall Resolution, Dean Guzman responded and refused to provide any information on the role the faculty played in the investigation process, and instead stated that this would violate confidentiality.

120.  Further, Dean Guzman explained his efforts during the investigation period were focused on interviewing Professor Montgomery Rich to ensure that the findings of the investigation were consistent with Professor Montgomery Rich's version of the events.

121.  Upon information and belief, Dean Guzman failed to provide an adequate investigatory process into the complaints filed by Professor Rich as evidenced by his need to produce findings consistent with the view of Professor Montgomery Rich.

122.  Further, Dean Guzman failed to provide Professor Rich with any information on how the appeals process worked and refused to explain or otherwise outline the steps necessary for Professor Rich to file an appeal of Dean Guzman's findings.

123. By failing to provide Professor Rich with the grounds for appeal, Dean Guzman again knowingly violated the conditions Defendant USC had agreed to under the Tyndall Resolution.

124. On October 22, 2020, Professor Rich complained to both the OED and Dean Guzman of the lack of transparency and due process in both of the investigations.

125. Professor Rich further made complaints about the lack of information provided about credibility determinations and how there was no investigation into Professor Montgomery Rich's deceptive and vindictive behavior towards her or her explicit complaint of a hostile work environment.

126. In her October 22, 2020 complaints, Professor Rich again asked Dean Guzman to explain the procedure to file an appeal.

127. Professor Rich did not receive a response to her October 22, 2020 complaints and was still not provided any further information regarding her rights to appeal.

**C. Dean Guzman's and Defendant USC Law's Animus Against Professor Rich Escalates Following the Conclusion of the Investigations Against Professor Montgomery Rich**

**i. Dean Guzman's retaliatory actions.**

128. Upon information and belief, Dean Guzman held an animus against Professor Rich ever since her initiating complaint against Professor Montgomery Rich in July of 2019. This animus played a significant role in Dean Guzman's handling of the Section 3 investigation, as well as in Dean Guzman's everyday interactions with Professor Rich, causing catastrophic consequences for Plaintiff.

129. By way of example, during the 2020-2021 academic year, Dean Guzman attempted to push Professor Guzman to end her employment with Defendant USC Law.

130. Specifically, instead of allowing Professor Rich the opportunity to renegotiate and renew her retention deal with Defendant USC, Dean Guzman only provided Professor Rich with the opportunity to be released from the deal.

131.  Dean Guzman refused to authorize the granting of a housing subsidy for Professor Rich, the same subsidy that Professor Montgomery Rich had attempted to claim in prior meetings with Dean Guzman.

132.  Dean Guzman attempted to justify his denial of the subsidy based on an "insurance" rationale that is nowhere contained in any of Defendant USC's policies, and was, in fact, directly contradicted by Defendant USC's issuance of housing subsidy offers to another senior faculty member that same year.

133.  Further, Dean Guzman unilaterally took over the authorization of Professor Rich's expenses under her retention deal with Defendant USC Law thereby allowing himself the authority and ability to micromanage Professor Rich and scrutinize her in ways not previously available to Dean Guzman.

134.  Upon information and belief, Dean Guzman did not and has not placed himself in the same position of authority over another faculty member like he did to Professor Rich.

135.  Moreover, upon information and belief, Dean Guzman was responsible for the denial of classroom accommodations for Professor Rich. Specifically, as part of her accommodations request in light of her PTSD, Professor Rich requested a 50-person class size.

136.  This class size had been previously afforded to Professor Rich without any need for accommodation, thereby indicating Defendant USC Law's ability to limit the enrollment for Professor Rich's class.

137.  However, when the time came to again afford Professor Rich this accommodation and courtesy, noticeably asked for following her involvement in the Title IX process and complaints against Professor Montgomery Rich, upon information and belief, Dean Guzman ignored Plaintiff's request and assigned her a class of roughly 100 students, the largest class size she had ever been assigned in her career at Defendant USC Law.

### ii.    Defendant USC's retaliatory actions.

138.  Over the course of her tenure at USCGSOL, Professor Rich had launched the initiative to create Defendant USC Law's Race and Law Course, which began garnering positive media attention in or around February of 2021.

139.  Despite the positive impact the course and the attendant media coverage had on Defendant USC Law's reputation, Defendant USC Law decided it would rather lash out at Plaintiff and actively worked to divert media attention away from Professor Rich.

140.  In media reports, Defendant USC Law only gave recognition to other faculty members for the creation of the program and noticeably left out any acknowledgment of Professor Rich's contributions.

141.  By way of example, on February 4, 2021, Defendant USC released a press statement on the Race and Law Course. Noticeably, the original copy of the press release erased Professor Rich's role in the course's creation entirely. It was only after Professor Rich intervened and advocated for herself that her name and picture were added to the story.

142.  On February 26, 2021, Professor Rich was properly given credit for her involvement in the creation of the Race and Law Course in Defendant USC's newspaper, *The Daily Trojan*, but only after fighting for her name and contributions to be recognized.

143.  However, outside of internal publications such as *The Daily Trojan*, Defendants USC and USC Law continued to de-emphasize Professor Rich's contributions to the course. By way of example, on March 9 and 18, 2021, two other professors, Professor Gross and Professor Tolson, were solely given the credit by USCGSOL for the creation of the Race and Law course in the National Bar Journal and ABA Law Journal.

144.  Upon information and belief, Defendant USC's Press Office gave a story about the creation of the Race and Law course to the American Bar Journal and credited Professor Montgomery Rich, despite him having played no role in its creation.

145.  The consistent erasure of Professor Rich's involvement in the creation of such a monumental program for USCGSOL caused Professor Rich to abandon her advocacy for the course.

146.  The erasure of Professor Rich's contributions continued over the next year.

147.  Although Professor Rich was the founding Director of Defendant USC's First Generations Professionals Program, the USC Press Office removed all mention of her from articles

promoting the program, and instead credited a junior staff worker that had operated under Professor Rich's guidance in forming the program.

148.   Similarly, when Defendant USC sponsored a campus wide forum with Dean Guzman on academic freedom and discussions of race in the DEI era, it instead turned to a Criminal Law professor, rather than engage Professor Rich, who has previously served as an expert witness on the topic, consulted with USC Counsel on the issue, published on the subject and taught a First Amendment course featuring these issues for the past 10 years.

## VIII.   The New Vice President of Equity, Equal Opportunity, and Title IX Takes Over Professor Rich's Investigation

149.   On January 5, 2021, Professor Rich met with Catherine Spear ("Director Spear"), the new Vice President of Defendant USC's Equity, Equal Opportunity, and Title IX Office ("EEO-TIX"), previously the OED, to begin an appeal process of the two investigations into her complaints against Professor Montgomery Rich.

150.   Plaintiff duly submitted all necessary paperwork, as was known to her, in support of her appeals. Thereafter, Professor Rich patiently waited to hear a status update or other information regarding her appeals.

151.   Nearly six months later, on or about June 1, 2021, Director Spear finally contacted Professor Rich.

152.   At such time, Director Spear advised Professor Rich that her appeals had been closed.

153.   As part of her findings and decision to close Plaintiff's appeals, Director Spear pointed to Dean Guzman and Professor Montgomery Rich having been counseled on conflicts of interest and how these types of matters should be handled going forward.

154.   Upon information and belief, Professor Montgomery Rich and Dean Guzman were not counseled about their wrongdoing and no policies were changed.

155.   Director Spear also indicated that there will be a new, more "robust" conflicts of interest policy for the University.

156.   Specifically, the email to Professor Rich on June 1, 2021, which closed the investigation, stated the following:

"Since our last conversation, I had conversations with both the Dean and Professor [Montgomery] Rich, emphasizing best practice in the field; aspects of our new Policy on Prohibited Discrimination, Harassment, and Retaliation and how such matters would be handled going forward; and expectations and plans in the works at the University-level to develop a more robust conflict of interests policy. Our office now considers this matter closed and will be taking no further action. Please remember that reporting concerns to our office, as a designated employee or otherwise, is an activity that is protected from any form of retaliation. While I don't anticipate that to occur, please contact EEO-TIX should you ever have any questions or concerns in that regard, or be in need of supportive measures."

157.   Notably, Director Spear failed to provide Professor Rich with any substantive information or facts on how decisions related to the investigations were made.

158.   Rather, once again, Professor Rich was presented with an adverse decision favoring her male harasser (Professor Montgomery Rich) without any explanation or justification for its basis.

159.   Notably, similar to Dean Guzman's actions, Director Spear's summary disposition of Professor Rich's appeal violated the provisions of the Tyndall Resolution, which clearly obligated Defendant USC to provide "written notice of the outcome, the sanction and the rationale for each to both parties."

160.   To this day, Professor Rich has never received clear notice of the rationale for Director Spear's decision.

**IX.    Professor Montgomery Rich Uses Dean Guzman's Investigation Memo to Manipulate the Custody Proceedings of His and Professor Rich's Daughter**

161.   Upon information and belief, having been repeatedly cleared of any wrongdoing in the three deficient investigations conducted by Defendant USC, Professor Montgomery Rich felt more emboldened than ever to attack Professor Rich both on and off campus.

162.   In or about September of 2021, Professor Rich entered a neglect petition with the family court asserting her belief that Professor Montgomery Rich had not been providing adequate care for their minor child.

163.  In retaliation for filing the petition, Professor Montgomery Rich filed a response to the neglect petition which included Dean Guzman's memo stating that Professor Montgomery Rich had done no wrong.

164.  Professor Montgomery Rich's response also included information trying to manipulate the court into believing that the appeals delay was due to Professor Rich trying to punish Professor Montgomery Rich for his marriage to his former student in an effort to debase Professor Rich's character in front of the court.

**X.    Director Spear Neglects University Policy and Refuses to Help Protect Professor Rich From Professor Montgomery Rich's Retaliation**

165.  On January 27, 2022, Professor Rich reached out to Director Spear to schedule a meeting on how to receive protection from Professor Montgomery Rich's ongoing campaign of retaliation against her.

166.  Professor Rich asked Director Spear to help intervene and prevent Professor Montgomery Rich from continuing to use and mischaracterize the Title IX complaint and appeals delay to the courts in their custody proceedings.

167.  Despite originally telling Professor Rich that the EEO-TIX office would help protect her from retaliation, Director Spear contradicted herself and told Professor Rich that she would need to consult with Defendant USC's Counsel office before determining whether she could respond to the retaliation.

168.  After consulting with Defendant USC's counsel, Director Spear informed Professor Rich that no action would be taken and there was nothing she could do to help her.

169.  Once again, Director Spear's actions were in direct violation of the Tyndall Resolution Agreement which restructured Defendant USC's Title IX process to prevent inappropriate influence of University Counsel in Title IX investigations.

170.  Upon information and belief, Director Spear told Professor Rich that since Professor Montgomery Rich's actions occurred off-campus, the EEO-TIX office had no jurisdiction to help Professor Rich.

171. Upon information and belief, Director Spear also attempted to intimidate Professor Rich into abandoning her retaliation claim against Professor Montgomery Rich.

172. The actions of Director Spear directly violated University policy on how to handle retaliation against a reporting faculty party.

173. Specifically, the University's policy permitted the EEO-TIX to intervene when a reporting faculty member is retaliated against regardless of whether or not the retaliation occurred on campus. Still, Director Spear refused to do so.

174. Specifically, the Faculty Handbook Section 6-AA(2) dealing with Non-Protected Class Harassment states that:

> Subject to due respect for the protection of academic freedom, no faculty member may take actions that are harassing, abusive or intimidating against another member of the University Community, even if not based on a protected characteristic, if a reasonable person would have perceived them as objectively offensive.

175. In terms of Director Spear's outlandish statement that her office lacked jurisdiction because the events took place off campus, the Faculty Handbook Provision 6-B directly contradicts her statements.

176. Specifically, the Handbook states:

> This [anti-retaliation] policy applies to all behavior by a faculty member while performing a university role, or on campus or at a facility of the University; or at an activity under the auspices of the University; or when the reporting party is a faculty, or staff member, student, post-doctoral fellow . . . or which is adequate cause for discipline under Sections 8-C.

177. Upon information and belief, Director Spear acted with animus and neglect in her handling of Professor Rich's reasonable requests for protection and violated the terms of Defendant USC's policies by failing to come to Professor Rich's aid when it was squarely in Director Spear's authority to do so.

178. Upon information and belief, Director Spear neglected to consider or address Professor Rich's pleas for relief and instead informed Professor Rich that, based on the information

provided about the custody petition, she was considering referring Professor Rich's case to Child Welfare and Protective Services rather than pursue a retaliation investigation.

179.  Director Spear lacked any empathy towards Professor Rich's situation and failed to adequately provide her any assistance and support, despite originally promising Plaintiff the exact support she was requesting.

### XI.  Professor Rich is Forced to Take Disability Leave in January 2023 After Her Reasonable Accommodation is Not Respected

180.  On August 20, 2022, after her cries for help were rejected at multiple levels of the University's administration, Professor Rich received help from Defendant USC's disability office to protect her from having any further workplace contact with Professor Montgomery Rich.

181.  However, upon information and belief, Dean Guzman simultaneously began taking steps to deny classroom accommodations for Professor Rich.

182.  Specifically, as part of her accommodations request in light of her PTSD, Professor Rich requested a 50-person class size for her Spring 2023 class, beginning January of that year.

183.  This class size had been previously afforded to Professor Rich without any need for accommodation, thereby indicating Defendant USC Law's ability to limit the enrollment for Professor Rich's class.

184.  However, when the time came to again afford Professor Rich this accommodation and courtesy, noticeably asked for following her involvement in the Title IX process and complaints against Professor Montgomery Rich, upon information and belief, Dean Guzman ignored Plaintiff's request and assigned her a class of approximately 100 students, the largest class size Plaintiff had ever been assigned in her career at Defendant USC Law.

185.  Professor Rich emailed back and forth with Academic Dean Tom Lyon about the status of her accommodation request to teach under 50 students and was outright told that the Dean, meaning Dean Guzman, would not honor the accommodation.

186.  Professor Rich reached out to disability services who suggested that she take a leave of absence and disability services helped to streamline the process into taking such leave.

187.   As a result of Dean Guzman's steadfast refusal to accommodate Plaintiff's disability, and the disability office's refusal to override Dean Guzman's flagrant disregard for Plaintiff's disability needs and rights, Professor Rich was forced to take a leave of absence.

188.   Notably, Professor Rich's leave of absence was approved by Dean Guzman.

189.   Upon information and belief, Dean Guzman was doing everything within his power to make Professor Rich's work environment so intolerable that she would voluntarily resign.

## XII.   Professor Rich Continues to be Subjected to Harsh and Unfair Treatment after Coming Back from her Leave of Absence

190.   Professor Rich planned to return to teaching for the Spring of 2024.

191.   For her return, Professor Rich was advised that her normal accommodations contact person, Ms. Street, would no longer be working with her.

192.   Professor Rich and Ms. Street had developed a strong relationship throughout the years, and Professor Rich was unfamiliar with Ms. Street's replacement, Felicia Flores ("Ms. Flores") who was now assigned to Professor Rich's case file.

193.   Upon meeting with Ms. Flores, it was obvious that Ms. Flores had no idea about Professor Rich's long history at the institution. Ms. Flores explained to Professor Rich that the 50-person class-sized accommodation could not be granted, despite it being easily and readily provided to Professor Rich in prior years.

194.   As an alleged justification for the denial, Professor Rich was told that Interim Dean Franita Tolson ("Interim Dean Tolson") could not predict class sizes in order to pre-emptively make the decision to limit enrollment in Professor Rich's classes to 50-persons maximum.

195.   However, this alleged issue had never arisen previously and is a normal part of staffing law school classes each year.

196.   Upon information and belief, Defendant USC was grasping at the proverbial straws in order to find any basis to deny Professor Rich's request for accommodations, as Dean Guzman (now Provost of the entire University) had already made up his mind that she could not have one but did not have any reason other than his animus against Plaintiff to deny the reasonable request.

197.   Importantly, Interim Dean Tolson followed Dean Guzman's decision on this matter, as the Interim Dean must have a final recommendation from Dean Guzman to become vested as Dean of USCGSOL.

198.   Therefore, instead of providing Professor Rich with the requested and reasonable, and easily achievable, accommodation, Ms. Flores attempted to belittle Professor Rich by offering to walk Professor Rich through the school building to find a classroom where she feels comfortable.

199.   After failing to provide Professor Rich with a 50-student class size accommodation, Interim Dean Tolson offered Professor Rich the option to turn the class into a 50-student class. Interim Dean Tolson used the excuse that this is the course of action the school takes for faculty teaching a course for the first time.

200.   Despite claiming that a 50-student class option was given to faculty teaching a course for the first time, Interim Dean Tolson had previously told Professor Rich in 2023 that there was no class size or course relief accommodation for persons newly teaching Race and the Law.

201.   The original refusal to allow a 50-person class for Professor Rich was the reason that Professor Rich had declined to teach the course for the 2023 academic year.

202.   Despite the thinly veiled excuses that Interim Dean Tolson stated to Professor Rich, the evidence of previous class sizes for Race and the Law proves otherwise. Specifically, the course has never enrolled more than 61 students. The registrar records indicate that anywhere from 2 students to 61 students have been enrolled in the course in the six times the course has been taught. Further, the records indicate that there is no 50-student cap for professors teaching the course for the first time.

203.   Upon information and belief, Gould did not want to have accommodation on the record for Professor Rich. The excuse they used to allow her a 50-person class size is a sham and façade to get around having to decide on the disability accommodation issue.

204.   To this date, the University and Gould have failed to tell Professor Rich if she received a permanent accommodation to teach up to 50 students.

205.  Indeed, approximately six (6) months ago, then Interim Dean Tolson advised Professor Rich that she would be provided an answer on her accommodation request "shortly." Instead, Defendants have simply terminated communication.

206.  By failing to issue a decision or communicate on this matter, Defendant USC has effectively denied Professor Rich the opportunity for fair review and/or appeal.

207.  As of February 2024, USCGSOL required Professor Rich to participate in a Merit Review process. In providing Professor Rich with her review, Scott Altman ("Mr. Altman") gave Professor Rich nearly failing scores.

208.  When Professor Rich requested clarification of her scores, Mr. Altman informed her that he would need to check his notes with Interim Dean Tolson and, after her authorization, confirmed that the "below standard" scores were binding.

209.  Professor Rich is aware of no professor that, after being told to take disability leave, was then judged on a faculty productivity standard based on full time, non-leave employees.

210.  Upon information and belief, USC Gould assigned Rich the sub-par scores in retaliation for Professor Rich's continued complaints of discrimination and retaliation, and requests for reasonable disability accommodations.

211.  After complying with Defendant USC Law's rules and abbreviated timeline for an appeal of this process, Professor Rich was told that it was unclear when Defendant would be able to reconvene the faculty evaluation committee to review its decision.

212.  Ultimately, Professor Rich was told that "Central" university had told USCGSOL to retract this decision, and USCGSOL would use Plaintiff's scores from a prior year in its place.

213.  Upon information and belief, USCGSOL was setting up a pattern of Professor Rich's ill-performance stemming from her leave of absence, which would constitute discrimination based on Professor Rich's PTSD disability.

### XIII.  USC's Conduct Demonstrates A Callous Disregard of the Tyndall Resolution Provisions Even During the Period of OCR Monitoring

214.  Defendant USC and those acting under its direct and/or indirect instruction and/or control, actions described herein unquestionably demonstrate that Defendant USC never even attempted a good faith effort to comply with the provisions of the Tyndall Resolution.

215.  Instead, Defendant USC effectively promoted and sanctioned the behavior of its employees and senior officials during the entire three-year period of the OCR's active monitoring of its enforcement of the resolution.

216.  Specifically, on information and belief, President Carol Folt was aware of Dean Guzman's decision to flout and circumvent the Tyndall Resolution when she promoted Guzman to be the Chief Academic Officer and Provost of USC in 2023, as she was required to be informed of all Title IX retaliation claims pending in each calendar year.

217.  Rather than sanction Dean Guzman, President Folt promoted him to Provost despite their being clear evidence of his violation of the Tyndall Resolution and further his retaliation against the Associate Provost of Diversity and Inclusion as she attempted to claim her rights protected by the resolution.

218.  Similarly, rather than sanction Professor Montgomery Rich for his retaliatory conduct, the University instead promoted Professor Montgomery Rich to an endowed professor position and gave him supervisory authority over Professor Rich by making him Dean of Intellectual Life.

## **CAUSES OF ACTION**

### **AS AND FOR A FIRST CAUSE OF ACTION**
*(Gender Discrimination in Violation of Title VII of the Civil Rights Act of 1964)*

219.  Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

220.  Plaintiff is a member of a protected class.

221.  Plaintiff was qualified to hold the position he held, and continues to hold, with Defendants.

222.  As set forth in detail above and herein, Defendants subjected Plaintiff to a hostile work environment on the basis of her gender.

223.  As set forth in detail above and herein, Defendants subjected Plaintiff to disparate treatment and disparate discipline on the basis of her gender.

224.  The discrimination that Plaintiff has suffered and continues to suffer while employed by Defendants severely affected, and continues to affect, the terms and conditions of her employment.

225.  By reason of Defendants' repeated and continuing violations of Plaintiff's statutory rights, Plaintiff has been deprived the equal enjoyment of the terms, conditions, and opportunities of her employment.

226.  As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

227.  Based on the foregoing, Defendants discriminated against Plaintiff in violation of Plaintiff's statutory rights, and is therefore liable to Plaintiff in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
*(Gender Discrimination in violation of Title IX of the Education Amendments of 1972)*

228.  Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

229.  Plaintiff is a member of a protected class.

230.  Plaintiff was qualified to hold the position he held, and continues to hold, with Defendants.

231.  As set forth in detail above and herein, Defendants subjected Plaintiff to a hostile work environment on the basis of her gender.

232.  As set forth in detail above and herein, Defendants subjected Plaintiff to disparate treatment and disparate discipline on the basis of her gender.

233.  The discrimination that Plaintiff has suffered and continues to suffer while employed by Defendants severely affected, and continues to affect, the terms and conditions of her employment.

234.  By reason of Defendants' repeated and continuing violations of Plaintiff's statutory rights, Plaintiff has been deprived the equal enjoyment of the terms, conditions, and opportunities of her employment.

235.  As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

236. Based on the foregoing, Defendants discriminated against Plaintiff in violation of Plaintiff's statutory rights, and is therefore liable to Plaintiff in an amount to be determined at trial.

### AS AND FOR A THIRD CAUSE OF ACTION
*(Gender Discrimination in Violation of the California Fair Employment and Housing Act)*

237.   Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

238.   Plaintiff is a member of a protected class.

239.   Plaintiff was qualified to hold the position he held, and continues to hold, with Defendants.

240.   As set forth in detail above and herein, Defendants subjected Plaintiff to a hostile work environment on the basis of her gender.

241.   As set forth in detail above and herein, Defendants subjected Plaintiff to disparate treatment and disparate discipline on the basis of her gender.

242.   The discrimination that Plaintiff has suffered and continues to suffer while employed by Defendants severely affected, and continues to affect, the terms and conditions of her employment.

243.   By reason of Defendants' repeated and continuing violations of Plaintiff's statutory rights, Plaintiff has been deprived the equal enjoyment of the terms, conditions, and opportunities of her employment.

244.   As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

245.   Based on the foregoing, Defendants discriminated against Plaintiff in violation of Plaintiff's statutory rights, and is therefore liable to Plaintiff in an amount to be determined at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION
*(Discrimination in Violation of the Americans with Disabilities Act of 1990)*

246.   Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

247.   At all times relevant, Plaintiff was a "qualified individual with a disability."

248.   Plaintiff was qualified to work as an employee for Defendants and she satisfactorily performed the duties required by the position she held at Defendants.

249.   Defendants were aware and on notice of Plaintiff's disability and the symptoms thereof.

250.  As set forth in detail above and herein, Defendants subjected Plaintiff to disparate treatment and disparate discipline on the basis of her disability.

251.  The discrimination that Plaintiff suffered while employed by Defendants severely affected the terms and conditions of her employment.

252.  By reason of Defendants' repeated and continuing violations of Plaintiff's statutory rights, Plaintiff has been deprived the equal enjoyment of the terms, conditions, and opportunities of her employment.

253.  As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

254.  Based on the foregoing, Defendants discriminated against Plaintiff in violation of Plaintiff's statutory rights, and is therefore liable to Plaintiff in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION
*(Disability Discrimination in Violation of the California Fair Employment and Housing Act)*

255.  Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

256.  At all times relevant, Plaintiff was a "qualified individual with a disability."

257.  Plaintiff was qualified to work as an employee for Defendants and she satisfactorily performed the duties required by the position she held at Defendants.

258.  Defendants were aware and on notice of Plaintiff's disability and the symptoms thereof.

259.  As set forth in detail above and herein, Defendants subjected Plaintiff to disparate treatment and disparate discipline on the basis of her disability.

260.  The discrimination that Plaintiff suffered while employed by Defendants severely affected the terms and conditions of her employment.

261.  By reason of Defendants' repeated and continuing violations of Plaintiff's statutory rights, Plaintiff has been deprived the equal enjoyment of the terms, conditions, and opportunities of her employment.

262.  As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

263.  Based on the foregoing, Defendants discriminated against Plaintiff in violation of Plaintiff's statutory rights, and is therefore liable to Plaintiff in an amount to be determined at trial.

### AS AND FOR A SIXTH CAUSE OF ACTION
*(Failure to Accommodate in Violation of the Americans with Disabilities Act of 1990)*

264.  Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

265.  At all times relevant, Plaintiff was a "qualified individual with a disability."

266.  Plaintiff was qualified to work as an employee for Defendants and she satisfactorily performed the duties required by the position she held at Defendants.

267.  Defendants were aware and on notice of Plaintiff's disability and the symptoms thereof.

268.  Defendants intentionally failed to provide Plaintiff, following due and proper request for same, with a reasonable accommodation despite such accommodation being available.

269.  The accommodation requested by Plaintiff did not pose an undue hardship on Defendants to provide.

270.  Defendants' refusal to accommodate Plaintiff's known disability severely affected the terms and conditions of her employment.

271.  By reason of Defendants' refusal to accommodate Plaintiff's known disability, Plaintiff has been deprived the equal enjoyment of the terms, conditions, and opportunities of her employment.

272.  Based on the foregoing, Defendants discriminated against Plaintiff in violation of Plaintiff's statutory rights, and is therefore liable to Plaintiff in an amount to be determined at trial.

### AS AND FOR A SEVENTH CAUSE OF ACTION
*(Failure to Accommodate in Violation of the California Fair Employment and Housing Act)*

273.  Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

274.  At all times relevant, Plaintiff was a "qualified individual with a disability."

275.  Plaintiff was qualified to work as an employee for Defendants and she satisfactorily performed the duties required by the position she held at Defendants.

276.  Defendants were aware and on notice of Plaintiff's disability and the symptoms thereof.

277.  Defendants intentionally failed to provide Plaintiff, following due and proper request for same, with a reasonable accommodation despite such accommodation being available.

278.  The accommodation requested by Plaintiff did not pose an undue hardship on Defendants to provide.

279.  Defendants' refusal to accommodate Plaintiff's known disability severely affected the terms and conditions of her employment.

280.  By reason of Defendants' refusal to accommodate Plaintiff's known disability, Plaintiff has been deprived the equal enjoyment of the terms, conditions, and opportunities of her employment.

281.  Based on the foregoing, Defendants discriminated against Plaintiff in violation of Plaintiff's statutory rights, and is therefore liable to Plaintiff in an amount to be determined at trial.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
*(Deliberate Indifferent in Violation of Title IX of the Education Amendments of 1972)*

282.  Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

283.  Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

284.  Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding.

285.  Defendants receive federal funding.

286.  Title IX is enforceable through a private right of action.

287.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of ... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added).

288.   The failure of a university to promptly and adequately address complaints of sexual assault and/or harassment amounts to "deliberate indifference" for which Defendant OU may be held liable under Title IX.

289.   As set forth herein and above, Defendants were deliberately indifferent to Plaintiff's credible complaints of harassment, discrimination, retaliation, and a hostile work environment.

290.   The discrimination that Plaintiff has suffered and continues to suffer while employed by Defendants severely affected, and continues to affect, the terms and conditions of her employment.

291.   By reason of Defendants' repeated and continuing violations of Plaintiff's statutory rights, Plaintiff has been deprived the equal enjoyment of the terms, conditions, and opportunities of her employment.

292.   By reason of Defendants' deliberate indifference to Plaintiff's complaints, Plaintiff was left vulnerable to, and indeed experience, further harassment.

293.   As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

294.   Based on the foregoing, Defendants acted with deliberate indifference to Plaintiff's complaints of discrimination, retaliation, and a hostile environment in violation of Plaintiff's statutory rights, and is therefore liable to Plaintiff in an amount to be determined at trial.

### AS AND FOR A NINTH CAUSE OF ACTION
*(Retaliation in Violation of the Americans with Disabilities Act of 1990, Title VII of the Civil Rights Act of 1964, and Title IX of the Education Amendments of 1972)*

295.   Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

296.  As set forth herein and above, plaintiff was subjected to a work environment rife with discrimination and hostility on the basis of her gender and/or disability.

297.  Plaintiff duly complained about the discrimination, harassment, and discriminatory hostility she experienced to the proper personnel at Defendants' institutions.

298.  In response to Plaintiff's complaints, Defendants failed to carry out an unbiased and thorough investigation into the merits of Plaintiff's reports of discrimination and a hostile work environment, and failed to follow their own policies for resolution of same.

299.  Rather, Defendants lashed out at Plaintiff and subjected Plaintiff to further scrutiny and a litany of adverse actions.

300.  Accordingly, Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff's complaints of discrimination and a hostile work environment.

301.  By reason of Defendants' repeated and continuing violations of Plaintiff's statutory rights, Plaintiff has been deprived the equal enjoyment of the terms, conditions, and opportunities of her employment.

302.  As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

303.  Based on the foregoing, Defendants discriminated against Plaintiff in violation of Plaintiff's statutory rights, and is therefore liable to Plaintiff in an amount to be determined at trial.

## AS AND FOR A TENTH CAUSE OF ACTION
*(Retaliation in Violation of the California Fair Housing and Employment Act)*

304.  Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

305.  As set forth herein and above, plaintiff was subjected to a work environment rife with discrimination and hostility on the basis of her gender and/or disability.

306.  Plaintiff duly complained about the discrimination, harassment, and discriminatory hostility she experienced to the proper personnel at Defendants' institutions.

307.   In response to Plaintiff's complaints, Defendants failed to carry out an unbiased and thorough investigation into the merits of Plaintiff's reports of discrimination and a hostile work environment, and failed to follow their own policies for resolution of same.

308.   Rather, Defendants lashed out at Plaintiff and subjected Plaintiff to further scrutiny and a litany of adverse actions.

309.   Accordingly, Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff's complaints of discrimination and a hostile work environment.

310.   By reason of Defendants' repeated and continuing violations of Plaintiff's statutory rights, Plaintiff has been deprived the equal enjoyment of the terms, conditions, and opportunities of her employment.

311.   As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

312.   Based on the foregoing, Defendants discriminated against Plaintiff in violation of Plaintiff's statutory rights, and is therefore liable to Plaintiff in an amount to be determined at trial.

## JURY DEMAND

313.   Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury on all issues.

## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff seeks a judgment against Defendants as follows:

(i)   A judgment against Defendants declaring that the practices complained of herein are unlawful and in violation of the aforementioned Federal and State laws;

(ii)   Preliminary and permanent injunctions against Defendants and its officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with Defendants, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

(iii)     An order restraining Defendants from any retaliation against Plaintiff for participation in any form in this litigation;

(iv)     All compensatory damages that Plaintiff has sustained as a result of the Defendants' unlawful discriminatory conduct, including back pay, front pay, damages to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment, emotional distress damages, general and special damages for lost compensation and employee benefits that she would have received but for the Defendants' conduct, and any other out-of-pocket losses that Plaintiff has incurred or will incur;

(v)     Punitive and/or exemplary damages against Defendants;

(vi)     Statutory pre- and post-judgment interest on all sums awarded, where available;

(vii)     An award of costs and attorneys' fees; and

(viii)     Any other relief the Court finds just and proper.

**Dated: June 26, 2025**

**BOOKE & AJLOUNY**

**By: *s/ Victoria Booke***
**Victoria Book, Esq | State Bar No.: 142518**

**-and-**

**NESENOFF & MILTENBERG, LLP.**

**By: *s/ Gabrielle M. Vinci***
**ANDREW T. MILTENBERG**
(***pro hac vice forthcoming***)
**GABRIELLE M. VINCI**
(***pro hac vice forthcoming***)

**Attorneys for Plaintiff**